[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION AND JUDGMENT ENTRY
* * * * *
This is an appeal from a judgment of the Erie County Court of Common Pleas, following a jury trial, which found appellant Bonita Lofties guilty of two counts of aggravated drug trafficking in violation of R.C. 2925.03
(A)(1), one count of aggravated drug trafficking in violation of R.C.2925.03(A)(5), and one count of possession of cocaine in violation of R.C.2925.03(A)(6).
On appeal, appellant asserts the following four assignments of error:
 "I. APPELLANT'S GUARANTEES AGAINST SELF-INCRIMINATION AND COMPULSIVE TESTIMONY WERE VIOLATED AND THE TRIAL COURT IMPROPERLY INTRUDED ON THE ATTORNEY-CLIENT RELATIONSHIP BY STATEMENTS MADE BY THE TRIAL COURT JUDGE IN CONTRAVENTION OF FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.
 "II. THE GOVERNMENT ENGAGES IN SENTENCE ENTRAPMENT OR SENTENCE MANIPULATION WHEN THE DRUG AGENTS ENTRAP DEFENDANT INTO COMMITTING GREATER OFFENSES OR NUMEROUS OFFENSES SUBJECT TO GREATER PUNISHMENT.
 "III. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR AND AN ABUSE OF DISCRETION IN IMPOSING THE MAXIMUM SENTENCE ON EACH COUNT AND REQUIRING THREE OF THE FOUR SENTENCES BE SERVED CONSECUTIVELY WITHOUT CONSIDERING THE MITIGATING FACTORS AS MANDATED BY R.C. 2929.12.
 "IV. WHETHER APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF THE UNITED STATES AND OHIO CONSTITUTIONS, DURING THE PRE-TRIAL PROCESS AND DURING TRIAL WHEN APPELLANT'S RETAINED COUNSEL FAILED TO RESPOND TO APPELLEE'S DISCOVERY REQUESTS, RESULTING IN THE EXCLUSION OF DEFENSE-ORIENTED EVIDENCE AT TRIAL, AND FAILED TO INTERVIEW, INVESTIGATE AND PREPARE APPELLANT'S WITNESSES PRIOR TO TRIAL, RESULTING IN IMPORTANT DEFENSE TESTIMONY TO NEVER COME BEFORE THE JURY."
The facts which are relevant to the issues raised on appeal are as follows. Cathy Jo Clinton was arrested and charged with a drug related offense. After her arrest, Clinton contacted members of the Erie County Drug Task Force ("Task Force"), and offered to make controlled purchases of drugs from her alleged supplier, appellant Bonita Lofties, in exchange for the dismissal of the charges against her. Appellant then became the target of a formal Task Force investigation, in which Clinton participated as a confidential informant.
On March 18, 1994, Clinton met with Detective Charles Sams of the Sandusky City Police Department. Before giving Clinton $300 with which to purchase cocaine, Sams searched Clinton and her automobile, and gave Clinton a tape recorder with which to record her conversations with appellant. Clinton then proceeded to appellant's residence at 913 Hancock Street in Sandusky, Ohio, which is located less than one thousand feet from the Monroe Street Elementary School. Shortly thereafter, Clinton returned to Sams with a quarter ounce of cocaine, which she stated had been purchased from appellant for $300. Appellant and her vehicle were then searched again, and Sams took the tape recording from Clinton.
On March 24, 1994, Clinton again met with Sams, who searched her and her automobile, and gave her $600 and a tape recorder. Clinton then went to appellant's residence, and returned to Sams with a half-ounce of cocaine, which she stated had been purchased from appellant for $600. Appellant and her vehicle were searched again, and the tape recording was given to Sams.
After the second purchase was completed, Task Force members sought and obtained a search warrant for appellant's residence. On March 30, 1994, Clinton was searched by Sams and given a tape recorder and $300. Clinton returned from appellant's residence with a quarter ounce of cocaine, after which she and her vehicle were searched, and the tape recording was turned over to Sams.
Shortly thereafter, Task Force members executed the search warrant. Pursuant to the search, police officers found several plastic bags, later found to contain a total of more than one hundred grams of cocaine, in a box on a shelf leading to appellant's basement, and approximately $7,300 under the mattress of appellant's waterbed. Police officers also confiscated a Health-O-Meter scale from appellant's kitchen. A search of appellant's person revealed $300 in cash in one of her pockets.
On April 19, 1994, appellant was indicted by the Erie County Grand Jury on two counts of aggravated drug trafficking in violation of R.C. 2925.03(A)(1), for knowingly selling cocaine in an amount less than the minimum bulk amount, one violation of R.C.2925.03(A)(5), for knowingly selling cocaine in an amount equal to or exceeding the bulk amount but less than three times the bulk amount, and one violation of R.C. 2925.03(A)(6), knowingly possessing cocaine in an amount equal to or exceeding three times the bulk amount. In addition, counts one, two and three contained specifications that the alleged cocaine sales occurred within one thousand feet of a school.
A jury trial was held on September 13, 14, 16, 19, 20 and 21, 1994, at which testimony was presented on behalf of appellee, the state of Ohio, by Clinton, Sams, Sandusky City School Associate Superintendent Michael DelSignore, United States Postal Inspector Michael T. Corey, Perkins Police Officer Valerie D. Ripley, Norwalk Police Detectives Gregory Mehling and Timothy McClung, Erie County Sheriff's Deputies John O'Nan and Terry Verble, Captain Curtis Muehling of the Sandusky County Police Department, and forensic scientists Scott Dobransky and John Olenik.
Clinton testified at trial that she had known appellant five or six years, and stated that she told Task Force officers she would help them "get Bonita busted" if pending drug charges against her were dismissed. Clinton further testified that she met with Sams each time before buying drugs from appellant, Sams searched her person and her automobile before and after every buy, and she purchased one quarter ounce of cocaine from appellant on March 18, 1994, one-half ounce on March 24, 1994, and one-quarter ounce on March 30, 1994. Clinton stated that appellant weighed the cocaine on a scale in her kitchen. Clinton testified on cross-examination that Sams searched her by asking her to turn her pockets inside out, and going through the con tents of her purse and her car.
At various times during Clinton's testimony, the audio tapes made on March 18, March 24, and March 30, 1994, were played for the jury. Generally, appellant and Clinton could be heard on the tapes discussing whether Clinton was purchasing "rock" or "powder." On the tape recording made on March 18, 1994, Clinton was heard asking appellant if she could return at 5:30 p.m. to pick up the item she had purchased, and appellant and Clinton discussed the possibility of another purchase of a "quarter" on the following Monday, and that the price was $300 per quarter ounce. On the tape recording made on March 30, 1994, it was clear that Clinton purchased "three" of something. The word "cocaine" was not spoken on any of the tapes.
Sams testified at trial that he often asks a confidential informant to make several purchases of cocaine from the target of an investigation before arresting the target, and that many drug buys are quick, with little or no words spoken. Sams further testified that he obtained the search warrant to search appellant's house on March 30, 1994, and that he met with Clinton and Detective Mehling before the warrant was executed. Sams stated that he photocopied the money before he gave it to Clinton, and that the search of appellant's house produced all $300 of the money he photocopied on March 30, 1994, $500 of the $600 he photocopied on March 24, 1994, and $260 of the $300 he photocopied on March 18, 1994.
Sams testified on cross-examination that the money was not tested for fingerprints, and he did not conduct a pat-down search of Clinton at any time; however, he did conduct a "visual" search of Clinton, and asked her to turn her pockets inside out.
DelSignore testified generally that school was in session at the Monroe Street elementary school in March 1994.
Corey testified that he helped search appellant's house, and that he found a scale in the kitchen which may or may not have been used to weigh cocaine, and that the scale contained no cocaine residue. Ripley testified that she was asked to search appellant's person, and that she found a "wad of money" in appellant's pants pocket, which she gave to Sams.
Mehling testified at trial that he conducted surveillance for all three drug buys, and he took the substances which Clinton gave to Sams to the Ohio Bureau of Criminal Investigation for analysis. He further testified that the type of search an individual is subjected to depends on what that person is wearing, and that he does not always conduct a pat-down search of a confidential informant. Mehling stated that as he drove by appellant's home on March 24, 1994, he saw someone in the drive way, but he could not say for certain that it was appellant.
McClung testified at trial that he called in Valerie Ripley to come to appellant's house to search appellant's person on March 30, 1994, because appellant was a female, and that Ripley took $300 from appellant's pocket during the search and gave it to McClung, who gave it to Sams.
O'Nan testified at trial that he helped search appellant's house on March 30, 1994, and that, in addition to the $7,360 under appellant's waterbed mattress, he found titles to three cars, a motorcycle, insurance policies, and telephone records. O'Nan further stated that there were numbers written on one of the documents, which may or may not have been calculations of amounts of money received for drug sales. Over defense counsel's objection, O'Nan testified that some of the telephone records reveals calls to El Paso, Texas, and California, which are known sources for drugs.
Verble testified at trial that she took appellant's fingerprints and palm prints on April 14, 1994, and that no prints were on record for appellant prior to March 30, 1994.
Muehling testified at trial that he observed Sams' search of Clinton's automobile on March 30, 1994, and stated that normally, a pat-down search of the confidential informant is conducted before a controlled drug buy.
Dobransky testified that he tested the substances in the bags given to Sams by Clinton, and all of them contained cocaine. He stated that the bag received on March 18, 1994, contained 5.1 grams of cocaine, the bag received on March 24, 1994, contained 14.4 grams of cocaine, and the bag received on March 30, 1994, contained 8.1 grams of cocaine. Dobransky further stated that the five bags taken from appellant's house during the search on March 30, 1994, contained a total of one hundred two grams of cocaine, and that cocaine is frequently packaged in plastic "baggies."
Olenik testified at trial that he analyzed the plastic bags and some paper items taken from appellant's house, and found appellant's fingerprint on one of the bags of cocaine. Olenik further testified that there was no way to tell when the finger print was placed on the plastic bag. Over defense counsel's objection, Olenik stated that fingerprints are easily rubbed off of plastic, unlike paper.
At the end of Olenik's testimony, the prosecutor rested and appellant's counsel made a motion for acquittal, which the trial court denied.
Appellant then presented the testimony of her accountant, Allen R. Nickles, her former attorney James R. Kellam, and Erie Metropolitan Housing Authority Inspector Kenneth Lilje, who testified generally that appellant owned several rental proper ties, she formerly had owned her own appliance sales and repair business and, as of the time of trial, she was employed as a ride maintenance operator at Cedar Point.
After Lilje's testimony was concluded, appellant indicated to the trial court that she wanted to testify on her own behalf. Following a discussion with the trial court and both parties' attorneys, out of the hearing of the jury, appellant testified as follows.
Appellant testified at trial that the money found by police was a combination of rent money she had recently collected for her eleven rental units and deposits collected from Clinton and others for a planned trip to Las Vegas. Appellant also testified that she keeps large amounts of cash in her house to hide it from bill collectors, and she had the scale in her kitchen because she buys food "in bulk." Appellant further testified that she did not "want to speculate" as to how the cocaine got into her house, and that she kept miscellaneous junk and cooking utensils on the landing where the cocaine was found.
On cross-examination, appellant would not admit her voice was on the tapes made by Clinton; however, later, after the tapes were replayed for the jury, she said it was "possible" her voice was on the tapes. Appellant also testified that the terms "rock" and "powder" refer to bromide, a chemical used in her appliance repair business, which she buys in bulk and sells to others, including Clinton. She stated that bromide is often sold in "quarters" and comes packaged in plastic bags. Appellant further testified that she never told her present trial attorney about selling bromide.
Out of the hearing of the jury, appellant stated to the trial court that he wanted her attorney to question her more thoroughly about her appliance repair business, and to introduce into evidence exhibits relating to materials she uses in her business. The trial court denied appellant's request, stating that all exhibits should have been exchanged with the prosecution before trial.
At the conclusion of appellant's testimony, the defense rested. On September 21, 1994, the jury found appellant guilty of all four charges as stated in the indictment. On September 26, 1994, a sentencing hearing was held, at which the trial court sentenced appellant to serve two concurrent terms of five to fifteen years in prison for counts one and three; one term of seven to twenty-five years, with actual incarceration of five years, for count two; and one term of five to fifteen years, with actual incarceration of three years, for count four. The trial court ordered the sentences for counts two and four to run consecutively with the terms pursuant to counts one and three. On October 5, 1994, appellant filed a motion for a new trial, which was denied by the trial court on November 21, 1996. On December 2, 1996, a timely notice of appeal was filed.
Appellant asserts in her first assignment of error that the trial court violated appellant's constitutional rights by making comments to her concerning her right to testify on her own behalf. In support thereof, appellant argues that the dialogue between appellant and the trial court "improperly intruded on the attorney-client relationship" by influencing the defendant to waive her right not to testify, thereby opening her up to cross-examination.
R.C. 2945.43 provides that, "[o]n the trial of a criminal cause, a person charged with an offense may, at his own request, be a witness, but not otherwise. * * *" Generally, in Ohio, a trial court has no duty to advise a defendant of his right to testify. State v. Oliver (1995), 101 Ohio App.3d 587; State v.Rutledge, (Sept. 27, 1994), Franklin App. No. 93APA08-1212, unreported; State v. Morrison (June 2, 1992), Franklin App. No. 91AP-1326, unreported; State v. Crosson (Mar. 30, 1990), Delaware App. No. 89-CA-26, unreported. However, there is no authority, either pursuant to statute or case law, which prohibits a court from explaining to a defendant his or her constitutional rights. See State v. Rutledge, supra.
The record in this case shows that a lengthy exchange took place between the trial court and appellant concerning appellant's desire to testify on her own behalf, the relevant portions of which are as follows:
 Court: "All right. Miss Lofties, now your counsel informs the Court that you are not going to testify; is that right?
Lofties: "I will testify.
Court: "You want to testify?
Lofties: "Yes.
Court: "You do?
Lofties: "Uh huh. * * *
"* * *
 Court: "Okay. Now, I'm on your case right now and I'm asking you, first of all, do you want to testify?
Lofties: "Yes, I do.
Court: "Okay. And you've talked that over with Mr. Snow?
Lofties: "For what counsel I have, yes.
Court: "And Mr. Snow has advised you what?
 Snow: "I have advised my client this. That if she testifies the State would have an opportunity to cross examine her using the tapes. The tapes, in my opinion, are harmful to the defense, and, number one, I don't see that it's a good idea to have them played again to the jury, particularly with the defendant speaking, because they may form an opinion as to what the voice is on the tape.
 "Secondly, the defendant, by testifying, will face cross examination by the State through Mr. Binette, and I'm sure that he'll cross examine her while he plays the tapes and ask them what different . . . ask her what different things on the tapes mean. That could be incriminating, and, because of those reasons, I strongly, strongly recommend that no way she should take the witness stand.
 Court: "Now, those are reasons why you shouldn't take the witness stand. If you don't take the witness stand, however, they may very well wonder why you don't tell your side of the story.
Binette: "But there's an instruction to that effect, Your Honor.
 Court: "Well, we . . . if you don't take the stand, we tell the jury that you have a Constitutional right not to testify and they're not to attach any significance to the fact that you did not testify. So, but once you do hit the stand, not only are the subject matters opened up that Mr. Snow refers to but also anything you do or say gets weighed on the witness stand, whereas if you stay over there at the counsel table, you heard me tell them in the beginning they're not to weigh that as any evidence until a person gets sworn under oath and takes the witness stand. That's when it becomes evidence. So you have to thoroughly think that through, but I guess Mr. Snow raises some very good points. That's reality what he's talking about.
Lofties: "I understand reality.
 Court: "But by the same token, in a sense, they might very well wonder why you don't speak. Now, do you want a few minutes —
Lofties: "And at this point —
Court: "Yeah.
 Lofties: " — my feelings are that because of the representation that I had they're going to very well wonder why I didn't speak and this is just my personal gut feeling. I know he's pretty much had his way and you only been doing as much as he objects to.
 Court: "Do you want to take a few minutes now to discuss this issue —
Lofties: "Could we?
"* * *
 Court: "All right. Now, Miss Lofties, you've had a chance to discuss your testifying or not testifying with your counsel and after that discussion what are your . . . what's your idea? What do you want to do?
Lofties: "I'd like to testify, please.
 Court: "Okay. And, Mr. Snow, what's your opinion at this point?
 Snow: "Well, my opinion hasn't changed, but Miss Lofties was trying to convince me that maybe we can win this way, so I'm prepared to go forward with it."
This court has reviewed the entire record of proceedings before the trial court and, upon consideration thereof and the law, finds that the trial court's dialogue with appellant concerning her decision to testify at trial was an attempt to determine appellant's understanding of her rights, and was not an attempt to improperly influence appellant to incriminate herself or to subject herself to cross-examination by the prosecution. Accordingly, appellant's first assignment of error is not well-taken.
Appellant asserts in her second assignment of error that she was improperly sentenced for four drug related offenses instead of one drug offense. In support thereof, appellant first argues that her actions "constituted a single course of criminal conduct" rather than four separate offenses. Next, appellant argues that Task Force officers improperly engaged in "sentencing entrapment," by asking Clinton to purchase cocaine from her on three occasions, thereby manipulating appellant into "committing a greater offense subject to greater punishment."
We first note that R.C. 2901.12(H), upon which appellant relies in support of her first argument, refers only to the criteria for choosing the venue in which a defendant who has committed offenses in different jurisdictions may be tried, and therefore is inapplicable in this case.
As to appellant's second argument, the concept of "sentencing entrapment," as used by appellant in this case, has not been recognized in Ohio. Appellant argues, however, that such a defense applies in this case, relying on United States v. Barth
(C.A.8, 1993), 990 F.2d 422, in which the United States Court of Appeals for the Eighth Circuit defined "sentencing entrapment" as "`"outrageous official conduct [which] overcomes the will of an individual predisposed only to dealing in small quantities" for the purpose of increasing the amount of drugs * * * and the resulting sentence of the entrapped defendant.'" Id. at 424, quoting United States v. Rogers, 982 F.2d 1241, 1245 (C.A.8, 1993).
Upon consideration, this court finds that, even under the standard of review set forth in Barth, supra, the facts in this case do not support a finding that the Task Force officers' conduct was outrageous or that appellant's will to deal only "in small quantities" of drugs was overcome. Accordingly, appellant's second assignment of error is not well-taken.
Appellant asserts in her third assignment of error that the trial court abused its discretion by sentencing her to the "maximum sentence on each count" and by ordering three of the four sentences to be served consecutively. In support thereof, appellant argues that the trial court "sentenced the Appellant to the maximum sentence on each Count without identifying any statutory factor which encouraged the maximum penalty," the aggregate minimum term of seventeen years exceeds the allowable term of fifteen years as set forth in former R.C. 2929.41(E)(2), and appellant was "punished for insisting on a trial" instead of pleading guilty in exchange for a lesser sentence.
The criteria for determining a minimum term of imprisonment for a felony listed in former R.C. 2919.12, which in effect at the time appellant was sentenced, were as follows:
 "(A) In determining the minimum term of imprisonment to be imposed for a felony for which an indefinite term of imprisonment is imposed, the court shall consider the risk that the offender will commit another crime and the need for protecting the public from the risk; the nature and circumstances of the offense; the victim impact statement prepared pursuant to section 2947.051 of the Revised Code, if a victim impact statement is required by that section; any statement by the victim pursuant to section 2930.14
of the Revised Code; and the history, character, and condition of the offender and his need for correctional or rehabilitative treatment.
 "(B) The following do not control the court's discretion, but shall be considered in favor of imposing a longer term of imprisonment for a felony for which an indefinite term of imprisonment is imposed:
"(1) The offender is a repeat or dangerous offender;
 "(2) Regardless of whether the offender knew the age of the victim, the victim of the offense was sixty-five years of age or older, permanently and totally disabled, or less than eighteen years of age at the time of the commission of the offense;
 "(3) The victim of the offense has suffered severe social, psychological, physical, or economic injury as a result of the offense.
 "(C) The following do not control the court's discretion, but shall be considered in favor of imposing a shorter minimum term of imprisonment for a felony for which an indefinite term of imprisonment is imposed:
 "(1) The offense neither caused nor threatened serious physical harm to persons or property, or the offender did not contemplate that it would do so;
 "(2) The offense was the result of circumstances unlikely to recur;
 "(3) The victim of the offense induced or facilitated it;
 "(4) There are substantial grounds tending to excuse or justify the offense, though failing to establish a defense;
"(5) The offender acted under strong provocation;
 "(6) The offender has no history of prior delinquency or criminal activity, or has led a law-abiding life for a substantial time before commission of the present offense;
 "(7) The offender is likely to respond quickly to correctional or rehabilitative treatment.
 "(D) The criteria listed in divisions (B) and (C) of this section do not limit the matters that may be considered in determining the minimum term of imprisonment to be imposed for a felony for which an indefinite term of imprisonment is imposed."
It is well-established that "[s]entencing is within the sound discretion of the trial court and is generally not disturbed upon review where the sentence is within the confines of the valid statute." Columbus v. Jones (1987), 39 Ohio App.3d 87,88; Toledo v. Reasonover (1965), 5 Ohio St.2d 22, 24. An abuse of discretion is more than an error of law or judgment and implies that the court's attitude is unreasonable, arbitrary, or unconscionable. State v. Adams (1980), 62 Ohio St.2d 151, 157.
Although a court is obligated to consider the mitigating factors set forth in R.C. 2929.12, it "is not bound by the mitigating factors in the exercise of its discretion." State v. Crouse (1987),39 Ohio App.3d 18, 20. In cases where a criminal sentence is within statutory limits, "the trial court will be presumed to have considered the mitigating factors unless there is a showing to the contrary."Id.
In this case, the sentences imposed by the trial court were within the statutory limits. Prior to imposing sentence, the trial court reviewed appellant's pre-sentence report, and considered the statements of appellant's counsel in mitigation. Those statements referred to appellant's lack of a criminal record, her good work record, her history of taking care of family members, and the fact that she raised her brothers and two of her own children. In addition, appellant's counsel asked the court not to "penalize" her for wanting a jury trial and refusing to enter a plea.
As for appellant's argument that her aggregate minimum sentence of seventeen years violates former R.C. 2929.41(E)(2), it is well-settled that "where a trial court's sentence exceeds the minimum established for consecutive terms, such judgment is not the basis of a reversible error, as the terms of former R.C.2929.41(E)(2) * * * are self-executing, automatically operating to limit the aggregate minimum sentencing term to fifteen years."State v. White (1985), 18 Ohio St.3d 340, 341.
Finally, appellant has not pointed to anything in the record which demonstrates that the trial court punished her for exercising her right to a jury trial.
Upon consideration of the entire record of proceedings which was before the trial court and the law, this court finds that the trial court did not abuse its discretion by sentencing her to the maximum allowable terms of imprisonment, or by ordering her to serve consecutive sentences. Accordingly, appellant's third assignment of error is not well-taken.
Appellant asserts in her fourth assignment of error that she received ineffective assistance of trial counsel. In support thereof, appellant argues that her retained counsel failed to interview Kellam and Nickles before they testified on appellant's behalf at trial, and that her trial counsel failed to respond to the state's request for discovery, resulting in the exclusion of certain evidence which the defense attempted to introduce at trial.
The standard to be applied to claims of ineffective assistance of counsel is well established:
 "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result." Strickland v. Washington (1984), 466 U.S. 668, 686.
The Strickland court set forth a two-part test for reviewing the claims of ineffectiveness:
 "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.
In analyzing the first prong of Strickland there is a strong presumption that defense counsel's conduct falls within a wide range of reasonable professional assistance. Strickland,supra, at 689. To prevail on an assertion of ineffective assistance of counsel, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. Id. at 689. In Ohio, a properly licensed attorney is presumed competent and the burden is on the appellant to show counsel's ineffectiveness. State v. Lytle
(1976), 48 Ohio St.2d 391; State v. Hamblin (1988), 37 Ohio St.3d 153.
The record reveals that appellant's counsel attempted to cross-examine Sams at trial by using a newspaper article and a death certificate to undermine Clinton's credibility. When the prosecution objected because the documents had not been provided to the state through discovery, appellant's counsel questioned Sams concerning Clinton's credibility by exploring the same subject matter, but without using the documents.
As to counsel's alleged failure to interview Kellam and Nickels before trial, it is well-settled that "decisions on what witnesses to call, whether and how to conduct cross-examination, and all other strategies or tactical decisions are the province of the lawyer after consultation with the client." State v.Rubenstein (1987), 40 Ohio App.3d 57, 64. In this case, Kellam and Nickles did testify at trial, and no admissible evidence exists in the record as to what additional testimony they may have presented.[1] This court may only review the evidence it has before it in the record from the trial court in deciding this appeal. See State v. Ishmail (1978), 54 Ohio St.2d 402.
Upon consideration, this court finds that appellant has not shown that counsel's representation fell below an objective standard of reasonableness, or that she was prejudiced by counsel's performance at trial. Accordingly, appellant's fourth assignment of error is not well-taken.
On consideration whereof, this court finds further that appellant was not prejudiced or prevented from having a fair trial, and the judgment of the Erie County Court of Common Pleas is affirmed. Court costs of these proceedings are assessed to appellant.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
 _______________________________ Peter M. Handwork, P.J.
JUDGE
 _______________________________ George M. Glasser, J.
JUDGE
 _______________________________ Richard W. Knepper, J.
JUDGE
CONCUR.
[1] Appellant has attempted to introduce evidence to this court, through the affidavit of K. Ronald Bailey, her appellate attorney, that Kellam and Nickles would have presented "substantial testimony" at trial which was beneficial to appellant, but were never afforded an opportunity to do so. Such evidence is inadmissible hearsay. See Evid.R. 801, 802.